# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 27. Motion for** | a Certificate of Appealability

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form27instructions.pdf

**9th Cir. Case Number(s)** | 25-930

**Case Name** | Luo v. People of California

**Lower Court or Agency Case Number** | 8:22-cv-01640-MEMF (KES)

What is your name? | Xingfei Luo

1. **What** do you want the court to do?

> I respectfully move this Honorable Court for a Certificate of Appealability (COA) pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b), permitting appeal from the denial of my petition for writ of habeas corpus under 28 U.S.C. § 2254.

2. **Why** should the court do this? Be specific. Include all relevant facts and law that would persuade the court to grant your request. *(Attach additional pages as necessary. Your motion may not be longer than 20 pages.)*

> Please see attached.

Your mailing address:

PO BOX 4886

City | El Monte | State | CA | Zip Code | 91734

Prisoner Inmate or A Number (if applicable)

**Signature** | /s/ Xingfei Luo | **Date** | Feb 19, 2025

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 27** | *New 12/01/2018*

1    When a habeas applicant seeks a COA, the court of appeals should limit its examination to a

2  threshold inquiry into the underlying merit of his claims. *Slack v. McDaniel*, 529 U.S. 473, 481

3  (2000). This inquiry does not require full consideration of the factual or legal bases supporting the

4  claims. Consistent with Supreme Court's precedent and the statutory text, the prisoner need only

5  demonstrate "a substantial showing of **the denial of a constitutional right**." § 2253(c)(2). He

6  satisfies this standard by demonstrating that jurists of reason could disagree with the district court's

7  resolution of his case or that the issues presented were adequate to deserve encouragement to

8  proceed further. *Id*., at 484. He need not convince a judge, or, for that matter, three judges, that he

9  will prevail, but must demonstrate that reasonable jurists would find the district court's assessment

10  of the constitutional claims **debatable or wrong**. See *Miller-El v. Cockrell*, 537 U.S. 322, 335-338

11  (2003).

12    Petitioner was subjected to successive prosecutions based on the same evidence. During the

13  second trial, the jury was made aware of her prior conviction; however, she was ultimately acquitted

14  of the charge of violating a restraining order by failing to remove nude photographs of Czodor that

15  were allegedly posted online by her. In the course of the proceedings, Petitioner sought discovery,

16  but her request was denied. ECF No. 59. She timely objected to the denial. The acquittal indicates

17  that the same set of facts and evidence, when properly presented to a different jury, led to a different

18  outcome. This shift strongly suggests that trial counsel in the first trial failed to adequately

19  challenge the prosecution's evidence or present a compelling defense, contributing to the

20  conviction. The fact that Petitioner was acquitted in the second trial demonstrates that, had trial

21  counsel performed competently, there is a reasonable probability that Petitioner would have been

22  acquitted in the first trial as well. The prejudice prong of the *Strickland* standard is satisfied because

23  the acquittal shows that, but for counsel's deficiencies, the outcome of the first trial could have been

24  different. The acquittal in the second trial suggests that the prosecution's case was exceptionally

25  weak, the jury may have been swayed by a competent counsel, and considering the evidence

26  discovered after trial no reasonable juror could find Petitioner guilty beyond a reasonable doubt.

27    The district court incorrectly concluded that a verdict from a subsequent case is not

28  competent evidence of actual innocence, relying on the standard set forth in *Schlup v. Delo*, 513

1    U.S. 298, 324 (1995). However, this conclusion is legally and factually flawed for two reasons: (1)

2    it mischaracterizes the subsequent prosecution, which was based on the **identical evidence and**

3    **allegations**, as a wholly separate case; and (2) the acquittal in the subsequent case, coupled with the

4    evidence presented in the habeas petition, demonstrates that no reasonable juror would have

5    convicted Petitioner in light of competent legal representation.

6        Pursuant to 28 U.S.C. § 2254(d)(2), a petitioner is entitled to habeas relief if the state court's

7    decision was based on an unreasonable determination of the facts in light of the evidence presented

8    in the state court proceeding. Section 2254(d)(2) permits a federal court to grant relief when the

9    state court's factual determination was "unreasonable," even if the state court's application of law

10   was reasonable. The district court erred in construing Petitioner's insufficient evidence claim as a

11   request for federal review of the correctness of the state court's application of its own procedural

12   rules. ECF No. 73 at 17-18. In *Lee v. Kemna*, 534 U.S. 362 (2002), the U.S. Supreme Court held

13   that a state procedural rule, though generally adequate, may be inadequate to bar federal habeas

14   review if its application in a specific case is arbitrary or fails to serve a legitimate state interest.

15   Federal habeas courts review insufficient evidence claims under 28 U.S.C. § 2254(d)(2), which

16   permits relief if the state court's decision "was based on an unreasonable determination of the facts

17   in light of the evidence presented in the State court proceeding." This standard requires federal

18   courts to assess whether the state court's factual findings were objectively unreasonable, not merely

19   incorrect.

20       A petitioner asserting his actual innocence of the underlying crime must show "it is more

21   likely than not that no reasonable juror would have convicted him in light of the new evidence"

22   presented in his habeas petition. *Schlup v. Delo*, 513 U. S. 298, 327 (1995). The threshold inquiry is

23   whether "new facts raise sufficient doubt about [the petitioner's] guilt to undermine confidence in

24   the result of the trial." *Id*. at 317. Petitioner has met the "more likely than not" standard and this is

25   also evidenced by her acquittal at the second prosecution.

26       The district court concluded, without analysis, that the impeachment evidence in this case is

27   insufficient to establish actual innocence under *Calderon v. Thompson*, 523 U.S. 538, 563 (1998),

28   and *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002). ECF No. 79 at 2-3. The district

court failed to consider that the prosecution's case rests entirely on the testimony of a single witness, Czodor, whose credibility is fatally undermined by multiple demonstrable falsehoods and inconsistencies. Unlike the speculative and collateral impeachment evidence in *Calderon* and *Gandarela*, the evidence here directly contradicts Czodor's testimony on material points, rendering his account inherently unreliable. When viewed collectively, this evidence establishes it is more likely than not that no reasonable juror would have convicted her in light of the new evidence. The prosecution's case against Petitioner is exceptionally weak, relying solely on the testimony of Czodor. There is no physical evidence, corroborating witnesses, or other independent proof. In such a case, demonstrating that the sole witness was dishonest or unreliable effectively negates the prosecution's evidence and establishes actual innocence. As such, Czodor's credibility is the linchpin of the prosecution's case. Here, the impeachment evidence completely destroys the prosecution's case, as Czodor's testimony is the sole basis for the charges against Petitioner. See *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (en banc) (granting habeas corpus where key prosecution witness was exposed as a habitual liar).

The exceptions to the *Dixon* rule are: (1) fundamental constitutional error; (2) lack of jurisdiction over the petitioner; (3) the trial court acting in excess of its jurisdiction; or (4) an intervening change in the law. See *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 1999) (listing the exceptions to the *Dixon* rule as set forth by the California Supreme Court in *In re Harris*, 5 Cal. 4th 813, 828 n.7 (1993)).

Because Petitioner's claims alleged federal constitutional errors and lack of jurisdiction, *Dixon* is not an independent bar as applied to those claims and her claims are not procedurally defaulted. *Park v. California*, 202 F.3d 1146, 1154 (9th Cir. 1999).

The district court fundamentally mischaracterized Petitioner's claims in Grounds One and Three and concluded – without applying facts in this case – that the dissemination of the photographs and the violation of the protective order were integral to criminal conduct in harassing the victim and, therefore, were not protected online speech.

**Ground One**

A married nudist who voluntarily sends his nude photos to a stranger with whom he had a

1  single encounter has no reasonable expectation of privacy in those photos. The dissemination of

2  such photos does not constitute a crime and is protected speech under the First Amendment. The

3  district court erroneously rejected a key legal argument without providing any binding legal

4  authority. Contrary to the district court's conclusion, the expectation of privacy is not absolute;

5  rather, it must be evaluated under a standard of reasonableness, as repeatedly emphasized by the

6  U.S. Supreme Court. The Vermont Supreme Court's holding in *State v. VanBuren*, 214 A.3d 791,

7  813 (Vt. 2019), establishes that an individual has no reasonable expectation of privacy in images

8  taken in a setting where there was no reasonable expectation of privacy or in images previously

9  distributed in a way that undermines that expectation. Because expectation of privacy is an essential

10  element of the crime under California Penal Code § 647(j)(4)(A), the district court's blanket

11  rejection of Petitioner's argument is legally flawed.

12      **A. The District Court Erred in Concluding That a Nudist Automatically Retains an**

13  **Expectation of Privacy**

14      The district court dismissed Petitioner's argument by asserting that "the idea that a nudist

15  cannot have the requisite expectation of privacy is without basis in law or common sense." ECF No.

16  79 at 4. However, this conclusion is unsupported by legal authority and contradicts well-established

17  principles concerning privacy rights. The district court failed to cite any legal authority supporting

18  the proposition that a nudist has a blanket expectation of privacy in all circumstances.

19  The U.S. Supreme Court has consistently held that an expectation of privacy must be objectively

20  reasonable. The touchstone of Fourth Amendment analysis is whether a person has a

21  "constitutionally protected reasonable expectation of privacy." *Katz v. United States*, 389 U. S. 347,

22  389 U. S. 360 (1967) (Harlan, J., concurring). Katz posits a two-part inquiry: first, has the

23  individual manifested a subjective expectation of privacy in the object of the challenged search?

24  Second, is society willing to recognize that expectation as reasonable? See *Smith v. Maryland*, 442

25  U. S. 735, 442 U. S. 740 (1979). The Katz test applies not only in Fourth Amendment contexts but

26  also in cases evaluating privacy rights under statutory schemes regulating non-consensual image

27  distribution.

28      Furthermore, the U.S. Supreme Court has emphasized that privacy protections do not extend

1 universally and must be evaluated based on context. See *Florida v. Riley*, 488 U.S. 445, 451 (1989)

2 (holding that an individual's expectation of privacy is diminished when partially exposing his

3 greenhouse to the public in an open area). The district court's refusal to apply this reasoning to the

4 present case—where a self-identified nudist, took nude images in a public setting and sent them to

5 individuals with whom he had no intimate relationship—ignores controlling legal principles.

6 **B. *State v. VanBuren* Supports Petitioner's Argument That Expectation of Privacy is a**

7 **Reasonableness Inquiry**

8 In *State v. VanBuren*, 214 A.3d 791, 813 (Vt. 2019), the Vermont Supreme Court analyzed a

9 statute similar to California Penal Code § 647(j)(4)(A) and concluded that an individual has no

10 reasonable expectation of privacy in images taken in a setting where such an expectation does not

11 exist or in images previously distributed in a way that undermines that expectation. The court

12 reasoned that expectation of privacy is a fundamental constitutional consideration and must be

13 evaluated in light of the totality of the circumstances, particularly where an individual voluntarily

14 exposes themselves to others.

15 Under this reasoning, a nudist who voluntarily takes nude images in a public setting and

16 distributes his nude images to a stranger forfeits any reasonable expectation of privacy in those

17 images. By ignoring the necessity of proving a reasonable expectation of privacy, the district court

18 effectively relieved the prosecution of its burden, rendering Petitioner's conviction unconstitutional.

19 Petitioner's case is analogous to *Vanburen*. The nude images at issue were taken in a public setting

20 and shared with an individual with whom the nudist had no meaningful relationship. Merely

21 knowing someone's name and meeting them once does not establish an intimate or confidential

22 relationship that would engender a reasonable expectation of privacy. As the Supreme Court of

23 Vermont held, the distribution of nude images in such circumstances undermines any claim to

24 privacy. 214 A.3d at 813.

25 **C. The Lack of an Intimate Relationship Undermines Any Reasonable Expectation of**

26 **Privacy**

27 Expectation of privacy is not presumed merely because an individual takes private images.

28 Rather, it depends on the relationship between the parties and the manner in which the images were

shared. Simply knowing someone's name or meeting them once does not establish the trust necessary to form a reasonable expectation of privacy.

Here, a married nudist had no intimate or confidential relationship with Petitioner that would justify an expectation of privacy in images he voluntarily shared. Courts have repeatedly held that individuals who voluntarily disclose private information to third parties lose any reasonable expectation of privacy in that information. See *Smith v. Maryland*, 442 U.S. 735, 736 (1979) (holding that even if a person did harbor some subjective expectation of privacy, this expectation was not one that society is prepared to recognize as "reasonable." When he voluntarily conveyed numerical information to the phone company and "exposed" that information to its equipment in the normal course of business, he assumed the risk that the company would reveal the information). Here, society would not recognize a married nudist's expectation of privacy as reasonable given the public nature of the setting where the nude images were taken and the lack of any meaningful relationship with the recipient of the images. Thus, even if the nudist subjectively believed his nude images remained private, such an expectation was legally unreasonable given the lack of any established relationship between the parties, he assumed the risk that the recipient would disseminate them.

**D. The District Court's Blanket Assertion Violates Due Process by Ignoring Reasonable Expectation of Privacy as an Element of the Crime**

California Penal Code § 647(j)(4)(A), like the Vermont statute at issue in *VanBuren*, requires a reasonable expectation of privacy as an element of the crime. The district court erred in dismissing Petitioner's argument outright and failing to require proof of this essential element.

**Grounds Two, Eight, Nine, Nineteen through Twenty-Two, Twenty-Five, Twenty-Nine, and Thirty**

A petitioner's claims may be procedurally defaulted if they were not properly presented to the state courts in accordance with state procedural rules. See *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). However, procedural default may be excused if the petitioner can demonstrate cause for the default and prejudice resulting from the alleged constitutional violation. *Id*. at 750. Ineffective assistance of counsel can constitute cause to excuse procedural default. *Murray v.*

*Carrier*, 477 U.S. 478, 488 (1986). To establish cause, Petitioner must show that counsel's performance was constitutionally deficient under *Strickland v. Washington*, 466 U.S. 668 (1984), and that the deficient performance prejudiced the defense.

**Ineffective Assistance of Counsel at Trial and on Appeal**

Petitioner received ineffective assistance of counsel both at trial and on appeal, which constitutes cause to excuse the procedural default.

**1.    Ineffective Assistance of Trial Counsel**

Trial counsel failed to raise critical objections and preserve issues for appeal, including failure to investigate and cross-examine, failure to object to inadmissible evidence, failure to present exculpatory evidence, etc. Under Strickland, counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different – a result of acquittal proven by the second jury trial. The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Trial counsel made no attempt to ensure Petitioner had a fair trial.

**2.    Ineffective Assistance of Appellate Counsel**

Appellate counsel failed to raise meritorious claims on direct appeal. The Ninth Circuit has held that appellate counsel's failure to raise significant and obvious issues on appeal constitutes ineffective assistance. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000).

Petitioner raised this claim on September 6, 2022 (ECF No. 2), yet the district court failed to identify it as unexhausted when it directed Petitioner to return to state court. ECF No. 10. Now, the district court improperly faults Petitioner for failing to exhaust a claim that it previously failed to identify as requiring exhaustion.

Petitioner's claims raised in the habeas petition should have been raised by appellate counsel unless they required new evidence discovered after trial, rendering a detailed identification of specific claims unnecessary. Petitioner reasonably relied on the district court's guidance and should not be penalized for the court's oversight.

The district court's failure to identify Petitioner's IAC-appellate counsel claim as

unexhausted in its September 14, 2022 order is fundamentally distinct from the circumstances in *Pliler v. Ford*, 542 U.S. 225 (2004), in which the court held that district courts are not required to explain the details of federal habeas procedure and calculate statutes of limitations. The district court's failure to identify an unexhausted claim in its September 14, 2022 order is a substantive determination that materially differs from a procedural warning or explanation about habeas procedures. The exhaustion determination is a judicial finding, not a procedural advisory.

Under 28 U.S.C. § 2254(b)(1)(A), district courts must ensure that petitioners exhaust state remedies before seeking federal habeas relief. This statutory obligation requires district courts to determine which claims are exhausted and which are not. See *Granberry v. Greer*, 481 U.S. 129, 133–34 (1987) (emphasizing the importance of accurately assessing exhaustion to avoid unnecessary delays in habeas proceedings).

In this case, the district court identified several unexhausted claims in its September 14, 2022 order but failed to include the IAC-appellate counsel claim, which Petitioner had raised on September 6, 2022. This failure to accurately determine the exhaustion status of Petitioner's claims constitutes a violation of the district court's statutory duty under § 2254(b)(1)(A).

Because Petitioner was denied effective assistance of counsel at both the trial and appellate levels, the procedural default should be excused.

Because Petitioner's first state habeas petition was filed before direct appeal was briefed, the district court's conclusion that Petitioner impermissibly raised claims in a state habeas petition rather than on direct appeal is erroneous. Petitioner filed his first state habeas petition before the direct appeal was briefed, making it impossible for Petitioner to raise these claims on direct appeal. This timing demonstrates that Petitioner did not intentionally bypass state procedures but was instead prevented from raising these claims due to the ineffective assistance of appellate counsel. The Supreme Court has recognized that procedural default may be excused when a petitioner is prevented from complying with state procedural rules due to external factors, such as ineffective assistance of counsel. *Carrier*, 477 U.S. at 488. Here, Petitioner's inability to raise claims on direct appeal was directly caused by the ineffective assistance of appellate counsel, and the filing of the state habeas petition before the direct appeal was briefed underscores this point.

1  The magistrate judge concluded that Appellate counsel could not have performed
2  unreasonably in declining to assert Ground Two because trial counsel stipulated that the protective
3  order was valid.

4  First, individuals cannot be bound by stipulations that relinquish constitutional rights
5  without informed consent. Trial counsel's stipulation to the validity of family court orders on
6  Petitioner's behalf, without obtaining her explicit, informed consent, effectively relinquishes her
7  constitutional right to challenge invalid restraining orders. In *Boykin v. Alabama*, 395 U.S. 238
8  (1969), the U.S. Supreme Court emphasized that certain rights—such as the right to a jury trial, the
9  right to confront one's accusers, and the right against self-incrimination—cannot be waived without
10 clear, informed consent by the defendant. Trial counsel had no legal authority to stipulate with the
11 prosecution to waive Petitioner's right to jury trial as to material facts and elements. There is no
12 evidence showing that Petitioner and Czodor, a married man, were in a dating relationship. See
13 *Miller v. Dormire*, 310 F.3d 600, 604 (8th Cir. 2002) (attorney's waiver of defendant's
14 right to jury trial without defendant's consent or understanding constituted structural defect).

15 In addition, it is black letter law that fundamental jurisdiction may not be conferred by
16 waiver, estoppel, or consent. *People v. Lara*, 48 Cal.4th 216, 227 (Cal. 2010). This principle is
17 similarly enshrined in federal law. The consent of the parties is irrelevant. *California v. LaRue*, 409
18 U.S. 109 (1972). No action of the parties can confer subject-matter jurisdiction. *Ins. Corp. of Ir. v.*
19 *Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 702 (1982). A party does not waive the
20 requirement by failing to challenge jurisdiction early in the proceedings. Id.

21                                    **Ground Three**
22 The restraining orders imposed a blanket prohibition on all speech related to Czodor,
23 including content, subjects, viewpoints, and images. An injunction, if upon its face it abridges rights
24 guaranteed by the First Amendment, should be struck down. *United Transportation Union v.*
25 *Michigan Bar*, 401 U.S. 576, 581 (1971). The Supreme Court has held that an unconstitutional court
26 order cannot serve as the basis for criminal liability. See *Shuttlesworth v. City of Birmingham*, 394
27 U.S. 147, 151-159 (1969) (conviction under an unconstitutional law or order is invalid and must be
28 overturned).

1

**Grounds Four through Six**

2      The district court mischaracterized the prosecution's case as "strong", despite the complete

3 absence of physical evidence, corroborating witnesses, or other independent proof. The

4 prosecution's case rested entirely on paper evidence produce by Czodor and the testimony of

5 Czodor, whose credibility is fatally undermined by his criminal background and inconsistent

6 statements to law enforcement. The prosecution's failure to disclose Czodor's criminal background

7 and inconsistent statements deprived Petitioner of a fair trial, as this evidence would have allowed

8 the defense to impeach Czodor's credibility and demonstrate that he changed his story over time to

9 invent criminal charges against Petitioner. The inconsistencies are not minor discrepancies but

10 fundamental changes in Czodor's account that strongly suggest fabrication.

11

**Ground Seven**

12      Czodor's testimony at trial was central to the prosecution's case, as he claimed that **a.**

13 Petitioner threatened to disseminate his nude photos between September 5 and September 7, 2018;

14 **b.** Petitioner followed through on the threat and disseminated the photos; **c.** the following week,

15 Czodor reported these incidents to law enforcement. However, the police field activity report dated

16 September 10, 2018 directly refutes Czodor's testimony. The report indicates that Czodor alleged

17 unfounded terrorism and made no mention of Petitioner or the dissemination of nude photos. This

18 inconsistency demonstrates that Czodor's testimony was false and raises serious doubt on the

19 credibility of the prosecution's entire case.

20      The false nature of Czodor's testimony is undisputable, as proven by the police field activity

21 report. The false testimony was material because Czodor's testimony and self-made evidence were

22 the only substantive evidence supporting the charge. No independent evidence or corroborating

23 witnesses existed. The prosecution either knew or should have known that the September 10, 2018,

24 report contradicted Czodor's statements, yet they failed to correct his false testimony. The police

25 field activity report is direct, objective documentary evidence that refutes the key factual premise of

26 the prosecution's case.

27

**Ground Ten**

28 Defense attorney failed to discover the facts that (1) Czodor was previously subject to

1  deportation; (2) Czodor was arrested for impersonation; (3) Czodor had prior criminal convictions

2  rested upon facts establishing dishonesty and/or false statements; (4) Czodor was a longtime

3  married man in 2018 when he connected with Petitioner as a single man never married and his wife

4  is ten years older than him; (5) No customer named Lilly on Czodor's Yelp page; (6) No company

5  named ⸺Gorgeous Painting ever existed. All these facts were directly relevant to Czodor's

6  credibility and motive to fabricate allegations against Petitioner.

7       In Petitioner's second trial, the jury was made aware of Czodor's marriage, which directly

8  undermined his credibility and contradicted his facet he created to the jury. The fact that Petitioner

9  was acquitted in the second trial strongly supports that this impeachment evidence was critical. The

10 district court offered no legal basis for concluding that cross-examination about Czodor's false or

11 inconsistent statements and prior dishonest acts would not have been permitted or would not have

12 benefited the defense. ECF No. 33 at 38-39.

13                                    **Ground Eleven**

14       The district court concluded that the email exchange on September 24, 2018, does not

15 include an accusation of vandalism. However, by failing to consider the sequence of Czodor's

16 actions, including his delay in reporting the alleged damage and his immediate reaction to learning

17 about the cost of removing a post concerning his credibility, the district court ignored compelling

18 evidence that Czodor fabricated his vandalism claim in retaliation for the cost of removing an online

19 post concerning his credibility.

20       September 18, 2018 – Czodor alleged that Petitioner damaged his front door but claimed he

21 did not discover the damage that night because it was "too dark". However, his front door area was

22 well-lit, rendering this claim implausible. ECF No. 6 at 159 (showing light showering Petitioner

23 from head to toe.)

24       **Timeline of Events**:

25       7:54 p.m.: Czodor allegedly recorded video of Petitioner scratching his door. ECF No. 6 at

26 157.

27       8:09 p.m.: Czodor called the police but made no mention of the scratching. ECF No. 6 at

28 201.

8:43 p.m.: The police left, and Czodor still had not reported the scratching. ECF No. 6 at 201.

**Implausibility of Omission**: If Czodor had video evidence of Petitioner scratching his door at 7:54 p.m., it is implausible that he would fail to report this critical detail to the police during his call or while they were present. This omission suggests that the scratching did not occur as alleged.

September 24, 2018 – Czodor learned that removing an online post concerning his credibility would require payment. Immediately after learning this fact, Czodor suddenly decided to take a photo of the allegedly damaged door—six days after the alleged vandalism.

September 26, 2018 – Czodor filed a vandalism report with the police, conveniently after discovering the financial burden of removing an online post. The substantial delay in reporting the vandalism is inconsistent with Czodor's immediate action of taking a photo of the allegedly damaged door immediately after learning the cost to remove the online post.

The fact that Czodor waited six days to document the alleged vandalism—and only did so after realizing he would incur financial consequences from removal of an online post—casts substantial doubt on the legitimacy of his accusation. This is particularly true by considering Czodor's lied that it's "too dark" but in fact his front door area was well-lit.

Trial counsel's rationale that "the less information, the better" is not a legitimate legal strategy but rather an abdication of the duty to investigate and present an adequate defense. The district court's conclusion that trial counsel's decision was strategic ignores that this was not a reasoned choice based on investigation but rather an uninformed and lazy approach to trial preparation. The omitted evidence—the victim's history as a nudist and the email exchange on September 24, 2018—was directly relevant to discrediting the prosecution's case and supporting Petitioner's defense. The decision to withhold critical evidence – a nudist's background to evaluate reasonable expectation of privacy and motive to fabricate the vandalism claim, as he reported the alleged damage to the police only after learning about the cost of removing the post – that directly undermined the victim's credibility and supported Petitioner's defense was not a legitimate strategy but a reflection of counsel's laziness and incompetence.

The omitted evidence would have significantly undermined the victim's credibility and

1  supported Petitioner's defense, creating a reasonable probability that the outcome of the first trial

2  would have been different. See *Strickland*, 466 U.S. at 694 (prejudice exists if there is a reasonable

3  probability that, but for counsel's errors, the result would have been different).

4  **Grounds Twelve and Thirteen**

5  Because Czodor and Petitioner met only once before he voluntarily sent nude photos, the

6  relationship fails to meet both the legal and factual definition of a "dating relationship." As a result,

7  both the violation of restraining orders and the expectation of privacy claim fail as a matter of law.

8  The domestic violence restraining orders were not lawfully issued because Petitioner and

9  Czodor did not have a qualifying dating relationship. The family court had no jurisdiction to issue

10  domestic violence restraining orders against Petitioner.

11  The lack of a dating relationship or any other relationship between Petitioner and Czodor

12  means that Czodor had no reasonable expectation of privacy in his nude photos. However, the

13  district court concluded, without considering the specific facts in this case, that presumably the

14  nature of the relationship that the Petitioner and victim were in is relevant to whether the victim had

15  the requisite expectation of privacy, whether that relationship met the legal definition of a "dating

16  relationship" is not. As stated above, trial counsel had no authority to stipulate to the validity of the

17  protective order because jurisdiction cannot be waived or stipulated.

18  A silent record is not the same as a refusal to justify strategy. This case is distinguishable

19  from situations where "a silent record cannot discharge a prisoner's burden" to prove ineffective

20  assistance of counsel. Here, trial counsel was offered the opportunity to explain his strategy but

21  deliberately chose to remain silent. This silence is affirmative evidence that there was no reasonable

22  basis for the decisions trial counsel made. ECF No. 78 at 61.

23  **Ground Fourteen**

24  The district court erred in concluding that trial counsel was not ineffective on the basis that

25  an argument regarding the admissibility of Petitioner's family court testimony would have been

26  futile. First, the correct standard for evaluating ineffective assistance of counsel is not whether a

27  particular argument would have succeeded, but whether counsel's performance fell below an

28  objective standard of reasonableness and prejudiced the defense. See *Strickland v. Washington*, 466

U.S. 668, 687 (1984).

Second, the record shows that trial counsel made no argument whatsoever before the trial court determined that Petitioner's testimony in family court would be presented to the jury. ECF No. 3 at 276-80. Trial counsel's complete failure to raise any argument on this critical issue constitutes deficient performance under *Strickland*.

Where defense counsel's failure to litigate a claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

The trial court was never even given the opportunity to fully consider the Fifth Amendment implications of admitting Petitioner's prior testimony, because trial counsel made no argument whatsoever before the ruling was issued. This is not a matter of reasonable strategy—it is a failure to perform the basic duty of a defense attorney to advocate for the client. See *Wiggins v. Smith*, 539 U.S. 510, 526 (2003) (holding that counsel's failure to investigate and present arguments cannot be justified as strategy when no meaningful effort was made).

**Grounds Fifteen and Sixteen**

The district court misinterpreted the evidence and concluded that Petitioner has not shown that the victim lied or made inconsistent statements about the damage to his door. Czodor claimed it was "too dark" for him to see damage on his door, yet his front door was brightly lit on September 18, 2018. This contradiction suggests fabrication. Czodor alleged that Petitioner scratched his door for 20 minutes, but the damage is inconsistent with such a prolonged attack. If his testimony were truthful, the damage should have been significantly more severe and he should have discovered the damage on September 18, 2018 after hearing 20 minutes scratching. ECF No. 6 at 175 (showing minimal damages.)

**Ground Seventeenth**

In *United States v. Pennell*, 737 F.2d 521 (6th Cir. 1984) (Celebrezze, J., dissenting), in response to threatening phone calls made to the homes of five jurors, the trial court specifically questioned those five jurors on whether the calls might affect their impartiality in the case. The

1  jurors responded, individually and consistently, that they did not believe the phone calls would

2  impair their ability to render a fair verdict. *Id.* at 530.

3      Key elements of juror rehabilitation and juror assurances of impartiality which are absent

4  here. See *Hughes v. U.S.*, 258 F.3d 453, 459 (6th Cir. 2001). The juror in question was a delivery

5  driver struggling to provide food for his family, experiencing anxiety and financial hardship, and

6  afraid to speak up. Even a single hour of jury service can impose significant hardship on a juror

7  experiencing financial and emotional distress, and the juror's inability to fully participate in

8  deliberations prejudiced Petitioner. However, no assurances of impartiality are shown on the record.

9      Had trial counsel objected and the juror been excused, there is a reasonable probability that

10  the outcome of the trial would have been different. See *Strickland*, 466 U.S. at 694 (prejudice exists

11  if there is a reasonable probability that, but for counsel's errors, the result would have been

12  different). This is supported by Petitioner's acquittal at the second trial.

13  **Ground Eighteenth**

14      Presuming waiver from a silent record is impermissible. See *Carnley v. Cochran*, 369 U.S.

15  506, 516 (1962). The Supreme Court has consistently held that the waiver of constitutional rights

16  must be knowing, voluntary, and intelligent. See *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("A

17  waiver is an intentional relinquishment or abandonment of a known right or privilege."). There is no

18  record that Petitioner knowingly and voluntarily waived her right to a speedy trial. The trial court

19  made no findings on the record to support a continuance. Because no valid waiver was entered into

20  the record, the district court's conclusion that Petitioner waived time is unsupported by law and fact.

21  See *Zedner v. United States*, 547 U.S. 489 (2006).

22      The district court failed to apply the tests set forth in *Barker v. Wingo* (1972) 407 U.S. 514

23  and *Mathews v. Eldridge* (1976) 424 U.S. 319 in assessing whether Petitioner voluntarily waived

24  her right to a speedy trial and whether trial counsel's ineffective assistance caused an unjustified,

25  prejudicial delay. The court's failure to engage in this analysis renders its conclusion legally

26  defective.

27      Petitioner's trial was delayed for nearly two years, an extraordinary length of time that

28  triggers a presumption of prejudice. See *Doggett v. United States*, 505 U.S. 647, 651-52 (1992)

1 (delay of one year or more is presumptively prejudicial). The district court cited the COVID-19

2 pandemic, but the trial court was closed for only one month. The delay of nearly two years far

3 exceeds any reasonable pandemic-related justification.

4 "[A] valid reason, such as a missing witness, should serve to justify appropriate delay."

5 *Barker v. Wingo*, supra, 407 U.S. at 531, 92 S.Ct. at 2192. See *United States v. Atkins*, 528 F.2d

6 1352 (1976). This case – a misdemeanor rather than felony case –  involved only one witness and

7 no complicated evidence—meaning there was no reasonable justification for a two-year preparation

8 period. The district court's conclusion that trial counsel needed this time for trial preparation is

9 unsupported by the record and fails to account for the simplicity of the case, especially when trial

10 counsel failed to conduct any investigation or meaningful cross-examination.

11 **Ground Twenty-Four**

12 The government's failure to preserve or collect potentially exculpatory evidence violated

13 Petitioner's due process rights under the Fourteenth Amendment. Czodor claimed to possess photos

14 and videos of Petitioner's alleged crimes, including scratching his doors, threatening to post his

15 nude photos, posting his nude photos, and communicating with his friends and customers. Instead of

16 using widely available forensic tools to properly collect and preserve this digital evidence, the

17 police allowed Czodor to dictate the relevance and integrity of evidence and to self-select and print

18 out evidence without ensuring its integrity or completeness. This conduct demonstrates bad faith

19 deprived Petitioner of critical exculpatory evidence and undermined the fairness of the trial. By

20 allowing Czodor to determine what evidence was relevant, the police effectively delegated their

21 investigative responsibilities to a biased party, violating Petitioner's due process rights. See

22 *California v. Trombetta*, 467 U.S. 479, 488 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

23 **Ground Twenty-Six**

24 The in limine motions focused on evidentiary issues, not a change in the nature of the

25 charge. A motion concerning the admissibility of evidence does not equate to conceding that an

26 entirely different charge can be added without time to prepare. The burden should not be placed on

27 the defendant to request a continuance when the prosecution's conduct—filing an amended

28 complaint on the eve of trial—created the need for additional time in the first place.

1    The prosecution's decision to amend the complaint on the eve of trial, despite having ample

2  opportunity to do so earlier, demonstrates a calculated strategy designed to prejudice Petitioner's

3  ability to prepare a defense. The lack of good cause on the record to justify this last-minute

4  amendment further underscores the violation of Petitioner's constitutional rights. A person cannot

5  incur the loss of liberty for an offense without notice and a meaningful opportunity to defend. E.g.,

6  *Hovey v. Elliott*, 167 U. S. 409, 167 U. S. 416-420. Cf. *Boddie v. Connecticut*, 401 U. S. 371, 401

7  U. S. 377-379.

8                              **Ground Twenty-Seven**

9    See Ground Eighteen.

10    A one-year post accusation delay will generally require a full review. *Doggett v. United*

11  *States*, 505 U.S. 647, 652 n. 1, 112 S. Ct. 2686 (1992). The length of the delay—is "presumptively

12  prejudicial" when it approaches one year. See *Doggett*, 505 U.S. at 652 n.1 (noting that delays

13  exceeding one year generally trigger a presumption of prejudice). Under *Doggett*, a delay of this

14  magnitude is presumptively prejudicial, and Petitioner need not show actual prejudice. The district

15  court's reliance on the fact that Petitioner was not incarcerated during the delay is irrelevant, as the

16  presumption of prejudice applies regardless of incarceration status. Here, the nearly two-year delay

17  far exceeds the presumptively prejudicial threshold and weighs heavily against the government.

18    Moreover, this case involved a misdemeanor charge with one witness and no complex

19  forensic or expert evidence. Such cases typically proceed far more quickly. The fact that the

20  prosecution failed to bring the case to trial within a reasonable period—despite its simplicity—

21  makes the delay even more unjustifiable. See *U.S. v. Mendoza*, 530 F.3d 758, 764 (9th Cir. 2008)

22  (holding that where "the government did not exercise due diligence," there is "a strong presumption

23  that [defendant] suffered prejudice"). The burden is on the government to justify the delay but one

24  month temporary close of court house due to Covid does not justify the nearly two-year delay.

25                              **Ground Twenty-Eight**

26    While the trial court may have claimed that Petitioner's motion was untimely or improperly

27  noticed (a reflection of ineffective assistance of counsel), the denial of a motion addressing a

28  constitutional right—such as a motion to dismiss for violation of the right to a speedy trial—cannot

1  be excused based solely on procedural technicalities. In *Zedner v. United States*, 547 U.S. 489, 509

2  (2006), the U.S. Supreme Court noted that the government, and by extension the courts, cannot

3  ignore speedy trial claims on procedural grounds where there has been a clear constitutional

4  violation. Therefore, even if Petitioner's motion was improperly noticed, the court had an obligation

5  to substantively address the constitutional claim raised.

6      The trial court's refusal to consider Petitioner's motion to dismiss for a violation of

7  Petitioner's right to a speedy trial deprived her of her constitutional protections, regardless of

8  whether the refusal was based on state procedural rules. See *Lee v. Kemna*, 534 U.S. 362, 375

9  (2002) (holding that federal habeas review is not barred by state procedural rules when the state

10 court's decision undermines federal constitutional rights).

11     AEDPA allows federal habeas review where the state court's decision resulted in a decision

12 that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as

13 determined by the Supreme Court of the United States" (28 U.S.C. § 2254(d)(1)). The trial court's

14 dismissal of the motion on procedural grounds without considering the constitutional merits is

15 arguably an unreasonable application of *Barker*.

**Ground Thirty-One**

17     Cumulative error may be grounds for federal habeas corpus relief, even when any single

18 error would not. *Parle v. Runnels* (9th Cir. 2007) 505 F.3d 922, 927-929, citing *Chambers v.*

19 *Mississippi* (1973) 410 U.S. 284; *United States v. Green*, 648 F.2d 587 (9th Cir. 1981).

20     The fundamental question in determining whether the combined effect of trial errors

21 violated a defendant's due process rights is whether the errors rendered the criminal defense "**far**

22 **less persuasive**," *Chambers*, 410 U.S. at 294, 93 S.Ct. 1038, and thereby had a "substantial and

23 injurious effect or influence" on the jury's verdict, *Brecht v. Abrahamson*, 507 U.S. 619, 637-38,

24 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

25     The district court improperly dismissed each of Petitioner's claims as "meritless" without

26 analyzing their combined prejudicial impact. The Ninth Circuit is particularly sensitive to

27 allegations of prejudice where, as here, the convictions are based on the largely uncorroborated

28 testimony of a single witness. See *United States v. Hibler*, 463 F.2d 455, 459 (9th Cir. 1972). The

1   Ninth Circuit is particularly troubled by the possible cumulative effect of those errors which go to

2   the credibility of the witness. *U.S. v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988).

3          Here, the cumulative impact of ineffective assistance of counsel both at trial and on appeal,

4   the prosecution of violation of unconstitutional restraining orders, the prosecution's reliance on

5   inadmissible testimony, manipulated evidence and perjured testimony, the prosecution's

6   withholding of *Brady* materials, the nearly two-year delay without good cause, the incorrect jury

7   instruction, and the trial court's refusal to consider the motion to dismiss etc. substantially

8   undermined the reliability of the verdict, which is supported by Petitioner's subsequent acquittal

9   based on the same evidence.

10                                    **Ground Thirty-Two**

11         Petitioner has identified a nonfrivolous issues that appellate counsel failed to raise and

12  shown that there is a reasonable probability that, had the omitted issue been raised, the appeal

13  would have had a different outcome. See above.

14                                    **Ground Thirty-Five**

15         The jury instruction was fundamentally incorrect because it referred to a written order that

16  the defendant not contact, send any messages to, follow, or disturb the peace of the protected

17  person, Tomas Czodor, not the websites that Petitioner was charged for.

18         The trial court's instructions specifically directed the jury to disregard any conflicts between

19  counsel's statements and the court's instructions. The trial court explicitly instructed the jury "If

20  you believe that the attorneys' comments on the law conflict with my instructions, you must follow

21  my instructions." Therefore, the jury followed the court's directive, focusing solely on the

22  instruction related to contact and messages rather than any discussions of online conduct. There is

23  no record showing the jury ever asked to clarify the jury instruction.

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I declare that I electronically filed the forgoing with the United States Court of Appeal for the Ninth Circuit. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

In addition, I electronically served the forgoing to the following email address:

michael.butera@doj.ca.gov

I declare under penalty of perjury under the laws of the State of California and United States of America that the foregoing is true and correct.

Executed on February 19, 2025

*/s/ XINGFEI LUO*

XINGFEI LUO, In Pro Per